Jerry Warren GROSHART, Appellant,

v.

UNITED STATES of America, Appellee.

No. 21517.

United States Court of Appeals Ninth Circuit.

March 27, 1968.

Harry D. Steward (argued), Federal Defenders, Inc., San Diego, Cal., for appellant.

Edwin L. Miller, Jr. (argued), U. S. Atty., Phillip W. Johnson, Asst. U. S. Atty., San Diego, Cal., for appellee.

Before MERRILL and ELY, Circuit Judges, and BYRNE, District Judge.

ELY, Circuit Judge:

Groshart appeals from his conviction, following a jury trial, of having smuggled and concealed marijuana in violation of 21 U.S.C. § 176a and of having smuggled amphetamine tablets and barbiturate capsules in violation of 18 U.S.C. § 545.

Groshart is a United States citizen. He was arrested on April 10, 1966, when he and a companion attempted to enter the United States from Baja California, Mexico. At the inspection point for the border crossing at San Ysidro, California, in the course of a routine border inspection, the Customs Inspector noticed that the spare tire of the station wagon being driven by Groshart was not in the tire well. This prompted the Inspector to cause Groshart to remove the top of the tire well. Inside, the Inspector saw a number of packages containing a substance later identified as marijuana. Further inspection disclosed that the tire well contained sixteen packages of marijuana and two jars of amphetamine tablets and barbiturate capsules and that the side panels of the vehicle contained an additional sixteen packages of marijuana. Both Groshart and his companion were placed under arrest.

At approximately 2:30 a. m. on the morning of the 10th, a Customs Agent, in the presence of a Supervisory Customs Port Investigator, began to interrogate Groshart. Before the interrogation com-

menced, the Customs Agent advised Groshart "that he was under arrest for smuggling marijuana into the United States and that he didn't have to make any statement and any statement he made could be used against him, or anyone else, and that he had a right to get an attorney any time he wanted one." The Customs Agent did not, however, advise Groshart that an attorney would be appointed to represent him if he was indigent and that he had a right to the presence of an attorney during any questioning.

During the course of the interrogation, Groshart informed the officers that he had been contacted on April 8th in San Jose, California, by a person identified only as "John" and that John had asked him if he would drive the station wagon to Mexico for the purpose of picking up a load of marijuana. Groshart further stated that on the morning of April 9th, he had met John, had received the station wagon, and had driven it to Mexico and parked it near a park in Tijuana, leaving it there for approximately four hours.

At the trial, before the jury, certain of Groshart's direct testimony was in conflict with the statements he had earlier made to the Customs Agent. He testified that he obtained the station wagon through a friend named Dick Long, that Long had agreed to loan his car to appellant for a trip to Mexico, and that Long had later changed his mind about loaning his own car. Groshart explained, however, that Long did obtain the car of one of his friends for Groshart to use, on the pretense that Groshart was "going surfing or something," and that this vehicle was the station wagon in which the contraband was found.[1] Groshart further testified that the station wagon was parked in Tijuana for approximately ten hours, while he and his companion shopped and entertained themselves in the city, and that he had not, until the inspection, known of the presence of the contraband in the vehicle.

The District Court ruled that Groshart's statements made during the interrogation could not be fully admitted into evidence, since it was apparent that they were obtained in violation of the rules established in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). However, after hearing argument and testimony in the absence of the jury, the district judge ruled that certain portions of these statements were admissible as evidence to impeach Groshart's testimony. In view of this ruling, Groshart admitted during cross-examination that he had stated during the interrogation that one "John" had contacted him on April 8th and asked him to drive the station wagon to Mexico. The Customs Agent then testified that Groshart had also stated that he had in fact received the car from John and had left it parked in Tijuana for about four hours. In accordance with the District Court's ruling, to which proper objection was made, all references to the purpose of the trip made by Groshart during the interrogation—that is, the purpose of obtaining marijuana—were omitted from testimony given in the presence of the jury. The District Court instructed the jury that evidence of the earlier, inconsistent statements was admitted only for impeachment purposes.

■■ The only specification of error is that this impeaching evidence was secured in violation of the fifth amendment and therefore should not have been admitted. The contention is valid.

In *Miranda* the Supreme Court held that

"when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence

---

1. Other testimony at the trial showed that the station wagon in fact belonged to a person named Sutelu, who is otherwise unconnected, apparently, with the case.

and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

384 U.S. at 478–479, 86 S.Ct. at 1630. Although the interrogation in question here occurred prior to the decision in *Miranda*, the rules of that case apply to trials commenced after the date of the decision. Johnson v. State of New Jersey, 384 U.S. 719, 733, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Here, the trial began on August 23, 1966; hence, the *Miranda* standard must be met. We must agree with the District Court that the statements made by Groshart during the interrogation were obtained without there having been compliance with the subsequently announced requirements of *Miranda*. Groshart was not informed prior to the interrogation that he had a right to the presence of an attorney during the questioning and that if he could not afford an attorney, one would be appointed for him prior to any questioning.[2]

As indicated previously, despite its holding that the incriminating statements were obtained in violation of the *Miranda* rules, the District Court ruled that certain parts of the statements could be admitted "for the sole purpose of im-

peaching." The correctness of this ruling is the crucial issue before us. See generally Kent, Miranda v. Arizona—The Use of Inadmissible Evidence for Impeachment Purposes, 18 W.Res.L.Rev. 1177 (1967); Comment, The Impeachment Exception to the Exclusionary Rules, 34 U.Chi.L.Rev. 939 (1967). The district judge stated the following conditions for admission of the parts of Groshart's statements: "The illegally obtained evidence or statement must not prove guilt, but may only be used to show unreliability of the witness. The evidence may not be used to impeach the defendant's denial of the material element of the offense, or to contradict his version of the facts constituting the offense." The district judge based this ruling upon the holding of the Supreme Court in Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1953). There, the defendant had been indicted in 1950 for possession of heroin, but the indictment had been subsequently dismissed because the only evidence of such possession had been obtained by an illegal search and seizure in violation of the fourth amendment. The defendant, however, was again indicted in 1952 for another, distinct offense of possession of heroin. In defense of this second charge, the defendant testified before the jury that he had never had any heroin in his possession. The trial court thereafter allowed the Government to introduce the evidence of the defendant's earlier possession for the purpose of impeaching his testimony. The evidence was admitted over the objection that the im-

---

**2.** The Supreme Court also held in *Miranda* that "if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." 384 U.S. at 445, 86 S.Ct. at 1612. Although we need not decide the issue in view of our above conclusion, it may be that this requirement was also violated in the present case. The Customs Investigator stated that Groshart had "volunteered" the statements "very readily." Groshart, however, testified as follows:

" * * * I said, 'Well, didn't you just say that I had the right not to

say anything?' And he said, 'Yes, but if you can mitigate the circumstances,' or something like this, 'well, we think we can help you, you see.'

"And then I further refused, and said—I didn't say anything—and he said—there were at least two times that this five to ten-year thing was mentioned—'You're facing five to ten years; unless you throw out a little more information so that we can help and find out who all was behind this, then there's no help for you. Now, let's talk.' And so I talked."

peaching evidence had been obtained in violation of the fourth amendment. The Supreme Court sustained the trial court's ruling. It wrote:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

" * * * Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."

347 U.S. at 65, 74 S.Ct. at 356.

Following the Supreme Court's decision in *Walder*, the courts of appeals were presented with a number of cases concerning this same issue and involving situations more similar to the present one than was that in *Walder*. The majority of these decisions arose in the District of Columbia Circuit. The first case, Tate v. United States, 109 U.S. App.D.C. 13, 283 F.2d 377 (1960), involved a conviction for theft of a typewriter from a hospital. The theft had been committed by two men. During a period assumed by the court to have been one of illegal detention, the defendant Tate had stated that he had come to the hospital with one Payne, who was arrested shortly after Tate for the same theft. Thereafter, however, Tate testified in

court that he had come to the hospital alone and that he was not acquainted with Payne. Despite the fact that the contradictory evidence was obtained illegally, the trial court allowed the Government to introduce evidence of the prior inconsistent statements. The court of appeals sustained the ruling, explaining that "when he gave one story to the police and another in court, and neither story covered any act which was *per se* inculpatory, the jury was entitled to hear both versions." 283 F.2d at 380. Furthermore, the court stated that "[t]he accused is still free to take the stand and truthfully deny all elements of the crime." However, "[o]nce he goes beyond denial of the crime itself and testifies as to collateral matters he is under an *added* compulsion to tell the truth." 283 F.2d at 381 (emphasis in original).

It is seen, therefore, that the *Tate* decision represented a broad interpretation of the scope of the *Walder* rule. In later decisions, however, there was retreat from the broad coverage of *Tate* in several significant ways. In Johnson v. United States, 120 U.S.App.D.C. 69, 344 F.2d 163 (1964), the court held that the illegally obtained impeaching evidence was not admissible, reasoning as follows: "To permit the Government to introduce illegally obtained statements which bear directly on a defendant's guilt or innocence in the name of 'impeachment' would seriously jeopardize the important substantive policies and functions underlying the established exclusionary rules." 344 F.2d at 166. Moreover, after citing Bailey v. United States, 117 U.S.App. D.C. 241, 328 F.2d 542, cert. denied, 377 U.S. 972, 84 S.Ct. 1655, 12 L.Ed.2d 741 (1964), wherein the court had alternatively held that the statement was not illegally obtained and that it, in any event, had been properly admitted for impeachment purposes, the *Johnson* opinion stated that "[o]ur own views * * * are more closely in accord with those which appear in the dissenting opinion of Judge Wright." 344 F.2d at 165 n. 2. In his dissenting opinion in *Bailey*, Judge

Wright had written that "use of inadmissible confessions for any purpose, including impeachment, is improper." 328 F.2d at 546 (dissenting opinion).

Soon after the *Johnson* decision the same court of appeals again faced a case of this type, and again it was held that the evidence in question was not admissible for impeachment purposes. *White v. United States*, 121 U.S.App.D.C. 287, 349 F.2d 965 (1965). In reaching this result in *White*, the court made it clear that the Government may not use otherwise inadmissible statements in order to impeach the defendant's testimony regarding his defense to the charge. 349 F.2d at 968. Finally, in *Inge v. United States*, 123 U.S.App.D.C. 6, 356 F.2d 345 (1966), the District of Columbia Circuit again held that the evidence was not admissible for impeachment purposes. The court explained:

> "[W]e have held that an inadmissible statement can be used only when the defendant makes 'sweeping claims' that go far beyond the crime charged, is impeached on a statement relating to 'lawful proper acts' 'collateral' to the issues before the jury, or is questioned about 'minor points.' In such situations, impeachment of the defendant affects only his credibility, since the truth of the impeaching statement does not itself tend to establish guilt."

356 F.2d at 349 (footnotes omitted).

These decisions of the District of Columbia Circuit were issued prior to the Supreme Court's far-reaching decision in Miranda v. State of Arizona, supra.[3] Writing for the majority of the Court in *Miranda*, Chief Justice Warren stated as follows:

> "The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of *any statement* made by the defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. *In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.*"

384 U.S. at 476–477, 86 S.Ct. at 1629 (emphasis added). Furthermore, the Court also explained that "unless and until such warnings and waiver are demonstrated by the prosecution at trial, *no evidence obtained as a result of interrogation can be used against him.*" 384 U.S. at 479, 86 S.Ct. at 1630 (emphasis added).

The prosecution contends that in *Miranda* the Supreme Court did not intend to forbid use by the prosecution of illegally obtained evidence under all circumstances. While this interpretation of the Court's language may be possible, we

---

3. As indicated previously, this issue was also resolved by other Circuits prior to *Miranda*. See United States v. Curry, 358 F.2d 904 (2d Cir.), cert. denied, 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1966) ; United States v. Grosso, 358 F.2d 154, 161–162 (3d Cir. 1966), rev'd on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). These decisions were generally in accord with those in the District of Columbia Circuit.

cannot accept it as correct. It would be a strained interpretation, an interpretation inconsistent with the Chief Justice's direct reference to the former use of such statements "to impeach" and with his immediately following injunction: "These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." 384 U.S. at 477, 86 S.Ct. at 1629.

▪▪▪ Accordingly, we hold that if statements are obtained from a defendant in violation of the *Miranda* rules and if the interrogation relates to an offense for which the defendant is ultimately brought to trial, those statements, as well as any portions thereof, may not be used against the defendant at the trial for any purpose whatsoever.[4] Whether the objective be to show guilt or to attack credibility, at the trial the prosecution must first show that the statements have been obtained in compliance with constitutional requirements as defined by our highest court. Insofar as *Walder* would compel a different result, it has, we believe, been undermined by the Supreme Court's *Miranda* decision.[5]

We are not alone in reaching this result. The Tenth Circuit has recently held as follows:

"While it is true that the court in Miranda was concerned with the admissibility of custodial statements as substantive proof of the facts related, we think the procedural safeguards prescribed there are equally important to a consideration of the admissibility of prior inconsistent statements for impeachment purposes. If the veracity of an accused person testifying in his own behalf is to be attacked by a prior inconsistent or contradictory statement made while he was under in custody interrogation, we think it is reasonable to require the Government to meet the burden of showing that the statement was voluntarily made after the accused had been fully advised of all of his rights and had effectively waived them in accordance with the standards prescribed by Miranda. To hold otherwise would permit an unconstitutional invasion of an individual's rights to be used as a weapon to influence the jury's consideration of his trial testimony."

Wheeler v. United States, 382 F.2d 998, 1001 (10th Cir. 1967); accord, Common-

---

4. Of course, the inability of the prosecution to use the defendant's statements would not prevent their admission where the defendant himself voluntarily seeks their introduction. We need not consider whether the fact of the existence, or even the content, of the statements should become available for use by the prosecution in the "unusual situation," recently considered by the Second Circuit, "where the defendant's testimony puts in issue the very question of what he told the police." United States v. Armetta, 378 F.2d 658, 662 (2d Cir. 1967).

5. Since *Walder* involved a situation where the evidence was tainted because of a violation of the fourth amendment, the decision in *Miranda* is not specifically applicable to that holding. It may be that there are noteworthy differences regarding the reliability of the evidence depending upon whether it consists of statements obtained through police interrogation or of the tangible fruits of a

search and seizure. See Comment, The Impeachment Exception to the Exclusionary Rules, 34 U.Chi.L.Rev. 939, 947–949 (1967). We need not reach this issue here but hold only that the authority of *Walder* is undercut by *Miranda* insofar as the rationale of *Walder* would apply to impeachment use of statements obtained in violation of constitutional standards. As we have noted previously, however, *Walder* involved an unusual situation where two distinct prosecutions had occurred and where evidence illegally seized in connection with the first prosecution was used for impeachment purposes during the second prosecution. Because of this unusual situation, some of the considerations that we discuss infra are not applicable to the same extent in terms of the *Walder* factual situation. We express no view as to whether *Walder* would, on its narrow facts, still withstand constitutional attack as applied to either illegally obtained statements or other evidence.

wealth v. Padgett, 428 Pa. 229, 237 A.2d 209 (1968). Similarly, the Oregon Supreme Court has recently stated:

"We are also unable to follow the 'middle ground' suggested in Tate v. United States, supra, to the effect that if a defendant merely takes the stand and denies his part in the crime he may not be impeached by the fruits of unconsitutional interrogation, but if he testifies about collateral matters he may be so impeached. Such a rule *would be virtually unworkable.* The usual reason a defendant chooses to take the stand is to give the jury a comprehensive statement of his side of the story. Any story that would be responsive to the questions raised by the state's case would tend to open up collateral matters and would invite impeachment if the tools of impeachment were at hand. The state should be free to impeach, but it ought to come by its impeachment as legally as it accumulates its other evidence."

State v. Brewton, —— Or. ——, ——, 422 P.2d 581, 583, cert. denied, 387 U.S. 943, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1967). These very recent decisions are persuasive. They furnish strong support for our conclusion—a conclusion to which we are impelled not only by the force of *Miranda,* but also by other important and very powerful considerations.

▪ In the present situation the facts to which Groshart's impeachment pertained can be characterized as either direct or collateral. All of the facts related to "lawful proper acts." The length of time during which Groshart left the car parked in Tijuana would appear to be a "minor point." And it would seem that the manner in which he obtained the station wagon is collateral to the principal issues of the case. At the same time, however, these facts also appear to be directly related to the elements of Groshart's defense to the charges, a defense based on the contention that he never knew that the dangerous drugs were in the car or that they were to be placed there.

As our holding indicates, we think that the distinctions between direct and collateral issues, between major and minor points, or between lawful and unlawful acts are essentially meaningless. We reject them because they are, as characterized by the Oregon Supreme Court, "virtually unworkable."

The defendant's testimony will often involve a chain of intimately connected events. Separation of the specifics of his testimony into one group of direct issues and one group of collateral issues, or separation according to one of the other supposedly simple distinctions, would ordinarily be an extremely difficult, if not impossible, task. Furthermore, the court could not stop there, but would be required to take the additional step of separation of the illegally obtained statements between those parts that would be totally inadmissible and those parts that would be admissible for impeachment purposes. Even if these were the only difficulties which would attend adoption of the Government's position, it is better to eliminate them also and thereby avoid, to all possible extent, needless cluttering in a sensitive area of fundamental rights.

The complications, however, would not stop there. Additional problems are seen when one considers the fact that the impeaching statements will generally, as was the case here, be presented to the jury out of the context in which they were made. When presented in the absence of the parts of the whole statement that surround or intersperse them, those parts admitted for impeachment purposes may take on a significantly different meaning or import than that which they may have originally had. Yet the defendant might not be able to rebut this altered meaning or import without himself introducing the otherwise inadmissible parts of the illegally obtained statements.

The ability of the prosecution to use portions of the statements illegally obtained from the defendant for impeachment purposes may also force the defendant to forego his right to testify in his own behalf. Such testimony would rarely be effective unless it provided a comprehensive explanation of the defendant's version of his connection, if any, with the alleged crime; yet such an encompassing explanation would immediately open the way for use by the Government of isolated parts of the illegally obtained evidence to attack the defendant's credibility. Cf. Simmons v. United States, 390 U.S. 377, 19 L.Ed.2d 1247, 88 S.Ct. 967 (1968).

Surely, too, we should not encourage law enforcement officials to interrogate one in violation of his constitutional rights with the sole purpose of obtaining evidence for use in impeaching him should he testify at a future trial or for the purpose of thereby preventing a defendant from taking the stand in his own defense. Impeachment is often an extremely significant factor in close cases. There is little doubt but that the great majority of the law enforcement officers of our Circuit strive to comply with the mandates of the Constitution. At the same time, they are engaged in a continuing, frustrating battle against lawlessness. If authorized to do so, they could not fairly be criticized for conducting unconstitutional interrogations designed to elicit possible impeachment evidence. This would be particularly likely in cases where it seemed probable that a constitutional interrogation would provide little if any useful evidence. Indeed, a two-step interrogation process would probably evolve—the first step being an unconstitutional interrogation designed to obtain possibly valuable impeaching evidence and the second being an interrogation conducted in compliance with *Miranda* in the hope of obtaining directly admissible evidence. Thus, there is significant danger that acceptance of the Government's position would tend to frustrate and defeat the manifest objective sought by the Supreme Court

in its *Miranda* opinion. Whatever may be one's individual evaluation of the exclusionary rule, it cannot be doubted that in this area the Supreme Court has established that it is necessary for the protection of the fundamental rights of all individuals. This being true, we will not attempt partially to open the door so clearly shut by the Supreme Court.

Reversed.

BYRNE, District Judge (dissenting):

I respectfully dissent.

On April 16, 1966, appellant crossed the border at the San Ysidro Port of Entry driving a 1950 Plymouth station wagon. A search of the vehicle revealed a number of packages of marijuana, amphetamine and seconal concealed in the tire well and side panels of the vehicle.

When interviewed by the officers, appellant was advised of his Constitutional rights as they had been delineated by the Supreme Court *at that time*. He was advised that he was under arrest; that he did not have to make any statement and that any statement he did make could be used against him. He was further advised that he was entitled to the presence of an attorney. *He was not advised that if he could not afford an attorney, one would be appointed to represent him.* This last caveat was added to the warnings required of an interrogator by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, decided by the Supreme Court on June 13, 1966, which was subsequent to the interrogation in this case.

The appellant voluntarily told the officers that a man named "John" had asked him to drive the Plymouth station wagon to Mexico for the purpose of picking up a load of marijuana; that the following morning he met John, received the station wagon and drove it to Mexico; that he parked it near a park in Tijuana, leaving it there for approximately four hours.

At the trial the Government was not permitted to use the admissions of the appellant during its case in chief as

Groshart had not been informed that if he could not afford an attorney one would be appointed for him. The trial judge correctly took the position that this was a violation of the new rule laid down by *Miranda*.

After the Government rested, Groshart, testifying in his own behalf, opened the subject of how he happened to be driving the car, and told an entirely different story from the one he had told the officers.

The trial judge relying on Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503, although not permitting the officer to testify to that portion of Groshart's statement in which he stated he was going to Mexico "to pick up a load of marijuana", did allow the officer to testify to Groshart's prior statement as to how he obtained the station wagon. The jury was instructed that the statements were admissible only upon the question of the credibility of the witness and not to establish the truth of the statements made.

The majority opinion relies on the Supreme Court's decision in *Miranda* as authority for their position that it was error to permit impeachment of Groshart's testimony by use of his prior statements. Not only is *Miranda* not dispositive of the appeal in the present case, but the question of admission of statements for the purpose of impeachment, which the majority correctly states "is the crucial issue before us", *was not in Miranda.* If *Miranda* held what the majority says it does, it would be dictum as the question was not in the case. It was not argued before the court, nor mentioned in any of the four opinions filed in the case.

Neither in the main opinion, nor in any of the three dissenting opinions in *Miranda* is the word "impeach" found, with the single exception of a tangential reference in the majority opinion.

"The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, *no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'*. If a statement made were in fact truly *exculpatory,* it would, of course, never be used by the prosecution. In fact, statements merely intended to be *exculpatory* by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement. In *Escobedo* itself, the defendant fully intended his accusation of another as the slayer to be *exculpatory* as to himself." (emphasis supplied)

By the use of this language the court is stating that the exclusionary rule is intended to reach *exculpatory* as well as inculpatory statements, and pointing out that statements of the defendant introduced by the prosecution under the guise of being exculpatory and not inculpatory, may have the effect of impeaching him by implication. This is entirely different from direct impeachment resorted to only after the defendant himself has affirmatively, and of his own accord, introduced the subject matter. This contrast is made clear by the Court in Walder v. United States, at page 65, 74 S.Ct. at 356:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

"Take the present situation. *Of his own accord,* the defendant went be-

yond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for *letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.*" (emphasis supplied)

The majority says the Supreme Court's decision in *Walder* has been "undermined" and "undercut" by the *Miranda* decision. This despite the fact that the question of impeachment was not in *Miranda;* that *Walder* was not mentioned in any of the four opinions filed in *Miranda,* nor is there any reference in any of the four opinions to the question which Judge Ely correctly states "is the crucial issue before us". As I view it, *Walder* is still the law on the "crucial issue" before us; it was binding on the District Court as it is on us; it was properly employed by Judge Kunzel, and I would affirm.

Although, as I have stated, it is my view that *Walder* is dispositive of this case, I feel constrained to refer to the policy grounds developed in the majority opinion and to say a word in support of the principle that the historical function of a trial is a search for the truth.

It is argued that the *Walder* doctrine might exert undesirable influence on an accused to refrain from testifying in his own defense. The logic of this contention is dispelled by Judge Burger in Tate v. United States, 109 U.S.App.D.C. 13, 283 F.2d 377, 381–382 (1960). The accused is free to deny the charges against him. Only perjury is deterred. Whatever inhibition arises is not against testifying, but against testifying falsely.