UNITED STATES of America
v.
Harry W. PREBISH, Paul Pollack, and Irving Weinstein.
No. 68–55–Cr–CA.

United States District Court
S. D. Florida,
Miami Division.

Sept. 20, 1968.

William A. Meadows, U. S. Atty., Michael J. Osman and Donald I. Bierman, Asst. U. S. Attys., and William G. Earle, Justice Dept. Atty., Miami, Fla., for the Government.

Daniel S. Pearson, of Pearson & Josefsberg, Miami, Fla., and Chester Bedell, Jacksonville, Fla., for defendant, Prebish.

Joseph A. Varon, Hollywood, Fla., for defendant, Pollack.

R. J. Beckham, of Beckham & McAliley, Miami, Fla., for defendant Weinstein.

## ORDER GRANTING MOTIONS TO SUPPRESS

ATKINS, District Judge.

This Court entered an order on August 14, 1968 granting defendant Weinstein's Motion to Suppress his Grand Jury testimony. Defendants Pollack and Prebish then filed Motions to Suppress. The government moved for a rehearing of defendant Weinstein's motion and this rehearing was granted. The rehearing was to give the government a chance to present further evidence on the defendant's voluntariness. This further evidence was also to be considered in ruling on the motion of defendants Pollack and Prebish which were then pending.

Prior to the government's presenting further evidence at the rehearing I made certain preliminary remarks to bring the legal questions into focus. The government then indicated their desire to appeal this Court's ruling on the motions and stated that the government did not desire to present any evidence at the rehearing. During the hearing I promised a formal order further clarifying and amplifying this Court's position on the motions. This order fulfills that promise.

## DEFENDANTS' MOTIONS TO SUPPRESS[1]

The testimony given at the motions to suppress is lengthy. Several important conversations were related and reiterated in great detail. In addition to the actual spoken words of these conversations, I was equally cognizant of the context in which the conversations took place. The context of these conversations is important in deciding just exactly what the parties present understood from the spoken words. Undue emphasis on actual words is misleading. My prior order of August 14 pointed out some important factors necessary in reconstructing the context in which these conversations took place.

After considering the testimony given on all motions to suppress, I find that the following types of statements were made by the government:

(1) That the government was primarily interested in finding the heroin;

(2) That the government was not interested in pursuing or prosecuting the present defendants but was interested in obtaining the heroin or getting assurances that it had been destroyed;

(3) That the government was not interested in prosecuting the defendants for bad judgment or for a technical criminal possession of heroin to which there was no defense;

(4) That the government wanted the defendants' help and cooperation in obtaining the heroin;

(5) That if the defendants testified before the grand jury and told all they knew—that is all the government was interested in;

(6) That if any of the defendants took the Fifth Amendment before the grand jury they would be indicted.

I do not find these statements were necessarily made in the order listed above or that the statements were made together in a composite policy statement of the government's position. These statements are simply relevant portions of conversations between defendants, defendants' counsel, and government counsel. Further, these statements were made in a context which the defendants believed consisted of (1) a primary desire on the government's part to find the

---

1. The defendants' Motions to Suppress are granted insofar as they relate to testimony given before the Grand Jury.

The motions are denied insofar as they relate to other conversations and communications.

heroin, (2) a general atmosphere of co-operation in which the government was seeking the assistance of the defendant, (3) a full realization by the government of the defendants' predicament concerning the attorney-client relationship. These beliefs on the part of the defendants were reasonable conclusions in light of the government counsel's actions and representations. These factors, while important in making up the context of the conversations, were not the only ones. A full understanding of the background of these conversations can only be derived by considering all the testimony given at the motion to suppress.

◼ Considering the six statements listed above and the context in which they were made, I find that a man in the defendants' position could have reasonably, logically, and in good faith believed that if he testified before the grand jury he would not be indicted but if he refused to testify he would be indicted. Further I find that each of the defendants did in good faith believe that if he testified he would not be indicted but if he refused to testify he would be indicted. On the basis of these two facts I find that the defendants did not voluntarily testify before the grand jury but testified because of the government's representations and the threat of being indicted.

The government has argued that these findings are erroneous for a number of reasons, two of which reasons will be considered. First, the government asserts that the grand jury testimony is in effect an exculpatory statement thus indicating the defendants' willingness and desire to make the statements. In the grand jury testimony the defendants admitted a knowing possession of heroin. Such testimony is hardly exculpatory.

◼ The government also argues strongly that the thrust of the inquiry should not be at voluntariness of the defendants but rather at the conduct of the government representatives. The government's position is outlined in their memorandum: " * * * in order to suppress a statement as involuntarily given, the Court must find that the *calculated misconduct of law enforcement officers* overcame the defendant's will to resist." (Government's emphasis). The short answer to this argument is that the Fifth Amendment right against self-incrimination is an individual citizen's right. An application of that right should be concerned with the voluntariness or lack of it when an individual incriminates himself. The application should not be *primarily* concerned with the bad or calculated action of government representatives. Further, I am always reluctant to classify the actions of government representatives as "calculated misconduct." Government agents are charged with the responsibility of bringing criminals to justice. Their actions and motives are directed at this important and laudable objective. If impermissible means are used in obtaining this end, corrective measures are necessary. But in the great majority of cases this impermissible conduct results from overzealousness in pursuit of a noble objective and does not result from bad motives. The government's arguments and especially the cases cited in their memorandum do emphasize one important factor. The government's promise or threat must have been sufficiently serious to have caused these defendants to act in reliance on it. I think the record clearly shows that the threat of indictment by a Federal Grand Jury was indeed a very serious threat to these defendants. During defendant Prebish's testimony, counsel stipulated to his prominence in this community and stated that I could take judicial notice of that fact. All three defendants are residents of this community, two are long-time practitioners in the field of criminal defense work. Judicial notice is not needed to realize the impact of a federal indictment upon these men's private and professional lives. The amount of narcotics involved and the fact that two of the defendants were attorneys assured wide publicity for an indictment and such publicity has indeed come to pass.

Considering the circumstances I think the threat of indictment was a very serious one that could reasonably be expected to and that did in fact overbear the defendants' will.

## THE GOVERNMENT'S MOTION FOR REHEARING

There has been much discussion over the legal underpinnings of the government's motion for rehearing. The argument has centered around the possible presence and meaning of what has been referred to as a "conditional promise." The government asserts that *if* any promises were made, then they were only conditional promises. This means that at very best the promise was that "if the defendants appeared and testified truthfully ('told all they knew') there would be no indictment." The government argues that the defendants did not tell the truth and this untruthfulness released the government from their promise of no prosecution if there was ever any such promise.

▮ I think it clear that the defendants did not believe that they could appear before the Grand Jury and testify to any facts they desired. What the government expected was truthful cooperation from the defendants in their testimony before the grand jury. But the presence of this condition of truthfulness does not warrant the application of contract principles in deciding the motions to suppress. Truth or falsity per se is not the test for determining whether testimony was voluntarily given.[2] If the threat of an indictment overbore the defendants' will and caused them to testify and in their testimony they colored the facts then despite this untruthfulness the testimony would still be involuntary and suppressable.

The government's motion for rehearing did not allege mere untruthfulness by the defendants in their testimony. The government argued that the grand jury testimony was voluntary and was part of a purposeful design and scheme to deceive the government.[3] If this is true then the defendant did not testify because of the government's promises or the threat of indictment. Instead the opportunity to testify before the grand jury was merely used by the defendants as an opportunity to deceive further the government and in the process take fraudulent advantage of any good faith promises the government may have made. On the basis of these arguments I granted the government's motion for rehearing to give the government the chance to present evidence that the defendants testified voluntarily pursuant to a purposeful design and scheme to deceive the government and fraudulently take advantage of the conditional promises made by the government. One method of proving this design or scheme on the part of the defendants would be to show the complete falsity of the defendants' testimony. The government could show that the grand jury testimony was so utterly false that it could only be part of a design or scheme to deceive the government. Of course, the complete falsity of the grand jury testimony was not the only fact that would prove voluntary testimony pursuant to a design or scheme. Other facts might have also proven their contention.

## THE REQUIREMENT THAT THE MOTION FOR REHEARING BE DECIDED BEFORE TRIAL

▮ In the motion for rehearing the government sought a chance to present further evidence on voluntariness prior to trial. Subsequently the government

---

**2.** Shotwell Mfg. Co. v. United States, 371 U.S. 341, 350 n. 10, 83 S.Ct. 448, 9 L.Ed. 2d 357 (1963); Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

**3.** It is interesting to note that during testimony on all the motions to suppress the government did not present one iota of evidence tending to prove that the defendants breached the condition of truthfulness by even coloring their testimony before the Grand Jury.

counsel stated that all the evidence in their case in chief would show that the defendants' grand jury testimony was part of a purposeful design and scheme to deceive the government. Thus, the government requested that I defer ruling on the motions to suppress until the close of the government's case in chief. I refused to do this and ordered that any further evidence be presented before trial. This order put a substantial burden on the government and I think the underlying reasons for the decisions should be delineated.

The primary reason for this order of proof was the possibility of fruit of the poisonous tree questions. Counsel, as usual, strongly differed over whether such questions were present in the government's case in chief. In light of the way the case had developed to that point I felt the poisonous tree questions would be frequent and difficult. With such questions lurking in the background I felt the issue of voluntariness should be decided before trial and not deferred until the close of the govenment's case in chief. To defer the question would require the court to answer poisonous tree questions *before* deciding the ultimate question of suppression when the poisonous tree questions themselves bore heavily on the content of the government's case in chief which in turn bore heavily

on the issue of voluntariness and suppression. I quite frankly did not feel capable of the mental gymnastics required by such a decision-making process.

Finally the decision to dispose of the question before trial was influenced by my initial order suppressing defendant Weinstein's grand jury testimony and the fact that all the defendants had established a strong case that the grand jury testimony was the result of government promises and the threat of indictment. Admittedly the government was burdened by the pretrial disposition of the question but at that point in the pretrial hearings that burden seemed clearly one of their own making. It was the government who had made the promises and voiced the threats that caused the motions to suppress. If these motions were to burden either side I thought it only fair that the government should be the party burdened.

## ATTORNEY CLIENT PRIVILEGE

■ The attorney-client privilege played an important role in the motion to suppress and charting a course in this area proved difficult. I felt that the government could cross-examine about (1) what government representatives had told the defendants and their counsel directly, (2) in what form these representations were conveyed to the other defendants and defendants' counsel[4] (3)

4. Defendant Weinstein never spoke directly with the government counsel nor was Weinstein's counsel present during the conversations with government counsel. Both Weinstein and his counsel were informed of the government's position by others. Normally, accepting a second hand version of the government's position on such an important matter would be hard to understand. But it seems reasonable in this case on a number of grounds. (1) Defendant Prebish and his counsel seem to have been representatives for all the defendants during most of the conversations with the government. This representative capacity seemed to have included reporting to the other defendants and their counsel what the government's position was. After one such conference defendant Prebish and his counsel proceeded directly to another meeting with the other defendants and

their counsel. (2) The government seemed to have recognized this representative capacity. In one case the government either acquiesced in or initiated a suggestion that Prebish and his counsel discuss the government's position with defendant Weinstein. (3) One counsel for defendant Pollack did call up and get confirmation from the government of defendant Prebish's report. This counsel seemed to be satisfied that defendant Prebish's version was substantially correct. (4) Much of the relaying of the government's position to defendant Weinstein was handled by a member of the Florida Judiciary. This judge either volunteered in the government's presence or was requested by the government to talk to defendant Weinstein concerning the government's position in this case. Considering all these factors it was not unreasonable for defendant Weinstein and

whether defense counsel had relied on these representations in advising the defendants to testify before the grand jury, (4) and whether the defendants had relied on the government representations in deciding to testify before the grand jury. I felt the attorney-client privilege prohibited the government from inquiring into (1) everything the defendants told their counsel (2) everything the defense counsel told the defendants, and (3) other factors the defendants and their counsel may have discussed that influenced the decision on whether or not to testify before the grand jury. If the defendants had waived the privilege by testifying or allowing their counsel to testify about the specific content of conversations between defendants and defense counsel then a different question would have been presented. But the defense counsel testified only that they and their counsel relied on these government representations. In the context of the case I did not think this testimony was sufficient to waive the attorney-client privilege concerning all conversations between defendants and their counsel.

The motion to suppress directly concerned the question of voluntariness. Voluntariness in turn was primarily a question of motivation. The discussions between the defendants and their counsel would of course have been highly relevant to the question of what motivated the defendants to testify before the grand jury. But while these discussions would have been highly relevant, I thought them to be clearly privileged.

## APPLICATION OF WALDER v. UNITED STATES

██ Government counsel requested a preliminary ruling on the application of Walder v. United States.[5] I have ruled that the grand jury testimony cannot be used for any purpose at trial. This ruling is of course premature. At this point it is uncertain whether the defendants will testify and if they do testify whether they will contradict their testimony before the Grand Jury. Further, there is no way of ascertaining how and to what degree the defendants will contradict their Grand Jury testimony. The facts contradicted and the degree of contradiction are central to one test that has been used during the evolution of the *Walder* principle.[6]

Despite the above factors indicating the question was premature, I thought that there were sufficient reasons for ruling on this legal question now. First, the government's position indicated that a present ruling was necessary. The government has stated all along that they intended to use the grand jury testimony *only* for impeachment purposes. This being the case, a ruling that only suppressed the Grand Jury testimony would leave the central issue unresolved since the only intended use for the suppressed testimony was for impeachment. Secondly, my decision that the Grand Jury testimony could not be used for any purpose at least renders moot the question of how much contradiction might develop. Further, all counsel agreed to a ruling on the question at this time. Finally,

his counsel to accept a secondhand version of the government's position. I find that previously listed statements were conveyed to defendant Weinstein and his counsel in substantially the same form as the government made them. While there were no doubt some slight alterations I find that the original version and the second hand version were substantially the same.

5. 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

6. The test referred to is enunciated in the following language from Inge v. United

States, 123 U.S.App.D.C. 6, 356 F.2d 345, 349 (1966):

> [W]e have held that an inadmissible statement can be used [for impeachment] only when the defendant makes 'sweeping claims' that go far beyond the crime charged, is impeached on a statement relating to 'lawful proper acts' 'collateral' to the issues before the jury, or is questioned about 'minor points.' In such situations, impeachment of the defendant affects only his credibility, since the truth of the impeaching statement does not itself tend to establish guilt.

since there promised to be an appeal on the factual issue of voluntariness I thought it best to resolve this issue so it could be argued on appeal also.

The principle of Walder is clearly stated by the following two excerpts from Mr. Justice Frankfurter's opinion: [7]

It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

* * * Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.

One rationale supports the principle enunciated in *Walder*. This rationale is simply a new application of the old saying that two wrongs don't make a right. Mr. Justice Frankfurter reasoned that the first wrong (illegality in obtaining the defendant's statement) when added to the second wrong (the defendant changing his story and thus clearly lying) didn't add up to a right result (justice). Thus, the presence of the first wrong shouldn't justify the second wrong of allowing the defendants to subvert justice by lying with impunity.

But there are two very strong reasons for questioning the result reached in *Walder*. The basis of an exclusionary rule is the vindication of a citizen's constitutional rights. Of course the unconstitutional act of infringement can never be blotted out: there can be only a partial vindication. The exclusionary rule achieves this partial vindication by assuring that the fruits or results of the illegal act cannot be used against the individual whose constitutional right was infringed. The instant case demonstrates how the *Walder* principle would work to negate even this partial vindication. In the instant case the government stated from the start that they only wished to use the grand jury testimony for impeachment. After lengthy hearings I found that the defendants' wills had been overborne and their constitutional right against self-incrimination had been infringed. But if *Walder* was followed, this finding of unconstitutional infringement would make absolutely no difference to the government. The government could do everything after the hearing and finding that it had desired to do before. In short, the benefits of the illegal act were, from the government's standpoint, just as available before the suppression as they were afterwards. Thus, if *Walder* had been followed there would not have been even a partial vindication of the individual's constitutional right.

A second reason for exclusionary rules is the hope that their prospective application will discourage violations of constitutional rights. In this regard the following language from Groshart v. United States [8] is very instructive:

Surely, too, we should not encourage law enforcement officials to interrogate one in violation of his constitutional rights with the sole purpose of obtaining evidence for use in impeaching him should he testify at a future trial or for the purpose of thereby preventing a defendant from taking the stand in his own defense. Impeachment is often an extremely significant

7. 347 U.S. at 65, 74 S.Ct. at 356.

8. 392 F.2d at 180. See also State v. Brewton, Or., 422 P.2d 581, 583, cert. denied,

387 U.S. 943, 87 S.Ct. 2074, 18 L.Ed. 2d 1328 (1967).

factor in close cases. There is little doubt but that the great majority of the law enforcement officers of our Circuit strive to comply with the mandates of the Constitution. At the same time, they are engaged in a continuing, frustrating battle against lawlessness. If authorized to do so, they could not fairly be criticized for conducting unconstitutional interrogations designed to elicit possible impeachment evidence. This would be particularly likely in cases where it seemed probable that a constitutional interrogation would provide little if any useful evidence.

Since the instant case is in many aspects "one of a kind" the prospective application of a decision here would not have significant effect upon interrogation practices. But the quote from *Groshart* does point out a major weakness of the *Walder* principle. That weakness is that *Walder* encourages the violation of citizens constitutional rights.

A third weakness of *Walder* is the difficulty of applying the principle enunciated there. As pointed out before *Walder* drew a distinction between "letting the defendant affirmatively resort to perjurious testimony" and freely permitting the defendant "to deny all the elements of the case against him." The first course of conduct would allow impeachment; the second would not. But the distinction has been easier to state than to apply. The Courts have struggled vainly with a number of tests designed to correctly apply *Walder*.[9] Finally, the Ninth Circuit Court of Appeals abandoned the *Walder* principle in Groshart v. United States.[10] In that case the Court was strongly influenced by Miranda v. State of Arizona but another equally compelling reason was the total unworkability of the *Walder* test. The Supreme Court of Oregon likewise has reached the conclusion that the *Walder*

principle is completely unworkable in application.[11] After considering the facts of the instant case, and considering in which areas contradiction might develop at trial, I can only agree with the two courts listed above that the tests for applying *Walder* are simply unworkable. I believe that the history of the *Walder* principle with its proliferation of tests for applying the principle and the Courts' growing dissatisfaction with these tests simply reflects a growing realization that *Walder* was a bad decision. In short the reasons against *Walder* have finally come to outweigh the reasons in favor of it.

---

9. The following cases discuss the various tests used: United States ex rel. Hill v. Pinto, 394 F.2d 470 (3rd Cir. 1968); Groshart v. United States, 392 F.2d 172 (9th Cir. 1968); Inge v. United States, 123 U.S.App.D.C. 6, 356 F.2d 345 (1966).

10. 392 F.2d 172.

11. State v. Brewton, Or., 422 P.2d 581, 583, cert. denied, 387 U.S. 943, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1967).