**Frank A. TATE, Appellant**

v.

**UNITED STATES of America, Appellee.**

**No. 15611.**

United States Court of Appeals District of Columbia Circuit.

Argued June 9, 1960.

Decided Oct. 20, 1960.

**378**

Mr. Macon M. Arthur, Washington, D. C. (appointed by this court) for appellant.

Mr. Frank Q. Nebeker, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before WASHINGTON, DANAHER and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Appellant was convicted under a two count indictment charging entering the District of Columbia General Hospital with intent to steal and theft of hospital property.[1] He received concurrent sentences of 16 months to 4 years on each count. The only question presented here is whether it was error for the District Court to receive, in rebuttal, statements asserted to have been made by appellant to police in a period of alleged "unnecessary delay" between arrest and preliminary hearing in violation of Rule 5(a), Fed.R.Crim.P., 18 U.S.C.A.

The evidence showed that appellant was seen in the General Hospital building on Saturday, with an unidentified man, at a time when the building was closed to the public. While there, appellant made inquiries about the contents of rooms on the floor where the two men were seen. The presence of the two men in this part of the hospital was observed and being irregular, was reported.

Appellant was later observed leaving the hospital grounds carrying a typewriter wrapped in a coat; an unidentified man preceded him. Appellant was arrested and taken to a cell on the hospital grounds. The unidentified man was not apprehended. One Payne was arrested nearby within about 10 minutes. Between the time of arrest and the preliminary hearing, appellant made statements to police which were not introduced by the prosecution in its case in chief.

Appellant took the stand on trial and in addition to denying all elements of the case against him, testified on his direct examination that he had come to the hospital alone to see a friend and that he had not known Payne before the time he and Payne were arrested. He explained possession of the hospital's typewriter by saying that moments before he was arrested someone unknown to him had thrust the typewriter into his arms. His explanation for running with the typewriter in his arms was that he was running after the unknown man to return the unwelcome gift.

The Government, in rebuttal, produced a police officer who testified that during the alleged illegal detention appellant told police that he and Payne had come to the hospital together by car. The officer's testimony was thus in direct conflict with appellant's direct testimony that (a) he had come alone and (b) that he was not acquainted with Payne.

We assume, arguendo, that the impeaching statements were made during a

1. 22 D.C.Code §§ 1801, 2206 (1951).

period of unlawful detention, although the District Court did not reach the question and we need not resolve it on the merits.[2]

Under Walder v. United States, 1954, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503, the admission of illegally obtained evidence of prior possession of narcotics was upheld as proper impeachment of a defendant's denial that he had ever had narcotics in his possession. The Supreme Court pointed out that the defendant of his own accord went beyond a mere denial of complicity and claimed he had never had illegal possession of narcotics. Of course he

"must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief." Id., 347 U.S. at page 65, 74 S.Ct. at page 356.

On the other hand a defendant cannot

"turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. * * * Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." Ibid.

The Supreme Court in Walder was faced, as we are here, with the problem of reconciling two competing policies of the law: (1) the policy that proscribes, as a prophylactic measure, the use of evidence obtained in violation of a rule of law, and (2) the policy which demands truth from witnesses in the judicial process and which regards an adversary judicial proceeding as a search for truth. The rationalization of these competing principles into a consistent pattern is by no means free from difficulty. See Lockley v. United States, 1959, 106 U.S.App.D.C. 163, 270 F.2d 915 (dissent); Starr v. United States, 1958, 105 U.S.App.D.C. 91, 264 F.2d 377, certiorari denied 1959, 359 U.S. 936, 79 S.Ct. 652, 3 L.Ed.2d 639. Cf. Opper v. United States, 1954, 348 U.S. 84, 91–92, 75 S.Ct. 158, 99 L.Ed. 101; Ercoli v. United States, 1942, 76 U.S.App.D.C. 360, 131 F.2d 354. The answer lies not in any rigid formula, but rather in a cautious balancing of the important considerations involved in keeping the trial process as an efficient means of determining the truth along with the need for keeping law enforcement practices on a level consistent with the standards of our society.[3]

2. The arrest occurred November 28, 1959, about 4:10 p. m. and he was taken to a local precinct station between 4:45 and 5:00 p. m., where he was booked. About 7:45 p. m. appellant was taken from his cell and interrogated for about 15 minutes during which time he made the statements used to impeach him. He was later released on bond and the preliminary hearing was held on Monday, November 30, 1959. Appellant testified that his statements to the police were voluntary; he expressly denied any force or coercion was used. Cf. Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

3. My views on this were set forth in a dissent in Lockley v. United States, 1959, 106 U.S.App.D.C. 163, 270 F.2d 915:

"It is my view that the proper procedure to be undertaken where a defendant testifies in direct contradiction to a written confession previously made but not offered in evidence is for the trial judge, when the confession is offered for impeachment purposes, to compare the defendant's testimony with the alleged confession, and to receive in evidence only that part of the written statement which does not go to the admission of acts which constitute necessary elements of the crime itself, but which at the same time constitute true impeachment of sworn testimony directly and precisely contradicted by the writing. For example, in the instant case the defendant's denial that he had seen his co-defendant on the day of the crime could be contradicted by reading only that part of the written statement in which defendant admitted spending time with the co-defendant; similarly he may be impeached on his statement 'I have never been to the place in my life,' and 'I couldn't go to it.'

In the instant case, it is plain that the court did not admit any statement which was *per se* inculpatory. None of the acts described in the challenged statements, in and of themselves, constituted "elements of the case against him." The statements, even if true and believed by the jury, described lawful proper acts in which appellant as well as his companions were free to engage.

Thus it is not a case where, under the claim of impeachment, a full and detailed confession of a crime was allowed to go to the jury to rebut specific and limited exculpatory statements made by the defendant on direct examination. Cf. Lockley v. United States, supra. The appellant's direct testimony here explained his presence at the scene by stating he came there alone to see a sick friend and that he did not know Payne, the alleged accomplice. The impeaching testimony established that he had told police a different story, i. e., that he came to the hospital with Payne and one Lawrence by auto. The statement on rebuttal was not inherently more incriminatory than the statement on direct; it was simply a different story but significantly different so far as his *credibility* was concerned. Appellant had a right to explain, as he did on direct examination, why and how he happened to be where he was found and arrested with stolen property in his possession. But when he gave one story to the police and another in court, and neither story covered any act which was *per se* inculpatory, the jury was entitled to hear both versions.

The weight to be given to this impeaching testimony was for the jury; if the jury accepted the officer's testimony as true, that would tend to cast some doubt on appellant's veracity. In this sense the impeaching testimony had an adverse impact on the defense. But the Supreme Court in Walder did not suggest that impeaching evidence is to be excluded because it is damaging; there is little point for prosecutors to offer, or courts to allow, impeaching evidence unless it has some relevance to credibility. We note however that the evidence allowed in Walder was vastly more damaging than the impeachment evidence here. Moreover the original motion to suppress the narcotics in the previous case had been granted because the evidence was seized in violation of a constitutionally protected right. Here the basis urged for exclusion of the oral statements is a violation of Rule 5(a) Fed.R.Crim.P., which, as has been pointed out, confers no "rights" in the constitutional sense.

That some truth is suppressed by the line of cases establishing the so-called "suppression rule," for judicial reasons thought to be overriding,[4] does not mean

---

Perhaps he may also be impeached on his denial of signing a written statement by the *fact* of the statement and signature itself, though not its contents." 106 U.S. App.D.C. at pages 168–169, 270 F.2d at pages 920–921.

4. Mr. Justice Jackson observed in his concurring opinion in a case prior to Mallory, supra note 2, but in a related area: "* * * What actual experience teaches [as to the suppression rule] we really do not know. Our cases evidence the fact that the federal rule of exclusion and our reversal of conviction for its violation are not sanctions which put an end to illegal search and seizure by federal officers. The rule was announced in 1914 in Weeks v. United States, 232 U.S. 383, [34 S.Ct. 341, 58 L.Ed. 652]. The extent to which the practice was curtailed, if

at all, is doubtful. The lower federal courts, and even this Court, have repeatedly been constrained to enforce the rule after its violation. There is no reliable evidence known to us that inhabitants of those states which exclude the evidence suffer less from lawless searches and seizures than those of states that admit it. * * *

"* * * That the rule of exclusion and reversal results in the escape of guilty persons is more capable of demonstration than that it deters invasions of right by the police. The case is made, so far as the police are concerned, when they announce that they have arrested their man. Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy against one

that the courts must always condone false testimony. Under the McNabb-Mallory doctrine the evidence is not excluded to *help* the defendant or as a *right*; he is an incidental and always an undeserving beneficiary; he is "undeserving" because the very thing suppressed is his own admission that he committed the act charged. It must be remembered that an involuntary confession is rejected independently of Mallory. It is only the protection of the integrity of the processes of law enforcement which can possibly justify the arbitrary and stringent impact of the suppression of truth in the judicial search for truth. Indeed Mr. Justice Frankfurter took great pains to make clear that this was precisely and narrowly the basis on which the McNabb-Mallory doctrine was predicated: *"In order adequately to enforce the congressional requirement* of prompt arraignment, it was deemed necessary to render inadmissible incriminating statements elicited from defendants during a period of unlawful detention."* Mallory v. United States, 1957, 354 U.S. 449, 453, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479. (Emphasis added.) At best the theory that judicial suppression of truth has a beneficial effect on the administration of justice is unproved and perhaps unprovable. But no other basis could conceivably justify the suppression of evidence otherwise admissible.

 Nothing we have said here saps the vitality of the McNabb-Mallory rule. The defendant is fully protected from inculpatory admissions made during detention involving "unnecessary delay" in holding a Rule 5 preliminary hearing. We hold simply that when a defendant elects to take the stand, com-

pelling considerations of justice require that we do all in our power to make certain he tells the truth and, as most oaths command, "the whole truth." The policy of the Supreme Court in suppressing statements procured in violation of Rule 5 is based upon what are considered overriding reasons, but Mr. Justice Frankfurter's opinion in Walder makes it clear that this does not give the defendant an unlimited license for perjury. There is nothing said or implied in any case from McNabb to Mallory, or in Walder, indicating that statements concerning lawful activity uttered during a period of "unnecessary delay" before preliminary hearing may not be received for impeachment of statements about the same matters made by the accused on his direct examination. We have no doubt that the impeaching evidence was properly admitted here.

We have considered whether the use of such admissions exerts undesirable influence on an accused to refrain from testifying in his own defense. We think it does not. The accused is still free to take the stand and truthfully deny all elements of the crime. Once he goes beyond denial of the crime itself and testifies *as to collateral matters he is under an added* compulsion to tell the truth. He may also have an added burden to provide a convincing explanation for any substantial inconsistencies which may be shown between his statement on the stand and contrary statements previously made; of course this is by no means confined to statements made to police or while in custody. Various statements made prior to his direct testimony might be available to impeach what he says in court, whether made before or after arrest and whether to police, friends or strangers. If impeached

---

lawbreaker because he has been pursued by another. It protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches. The disciplinary or educational effect of the

court's releasing the defendant for police misbehavior is so indirect as to be no more than a mild deterrent at best * * *." Irvine v. People of State of California, 1954, 347 U.S. 128, 135–137, 74 S.Ct. 381, 384–385, 98 L.Ed. 561. (Footnotes omitted.)

on a pheripheral non-inculpatory matter, he is of course free to explain the inconsistency, if indeed there is a rational "human error" explanation for the inconsistency. What is proscribed by Walder is the freedom to "resort to perjurious testimony" on the assumption that prior inconsistent statements would be kept from the jury. Neither sound public policy nor the ends of justice in the particular case would be served by a different rule. Whatever inhibition arises out of our view of the law it is not against testifying, but against testifying falsely.

Affirmed.

WASHINGTON, Circuit Judge.

I concur in the result, and in most of what Judge BURGER has said. But I cannot agree that the accused is merely "an incidental and always an undeserving beneficiary" of the McNabb-Mallory doctrine. The accused is presumed to be an innocent man until the Government proves him guilty. Very frequently a person under interrogation by the police is in fact innocent. In Mallory, for example, at least three suspects were examined at great length by the police. See 1957, 354 U.S. 449, at pages 450–451, 77 S.Ct. 1356, at page 1357, 1 L.Ed.2d 1479. It is common knowledge that many times the police have voluntarily released a man even after he has confessed, on the ground that the confession was a fabrication. Rule 5 protects the individual as well as society: it helps suppress untruth as well as truth. It may not create "constitutional rights," but it creates valuable protections for the individual. The decision in Walder cuts across these protections, and I agree that it controls the present case. But Walder must be applied with care, so that Rule 5 and the McNabb-Mallory doctrine will not lose their force and meaning.