234 So.2d 341 (1970)
Roy Lee YOUNG, Appellant,
v.
STATE of Florida, Appellee.
No. 37186.
Supreme Court of Florida.
April 22, 1970.
*343 Jack J. Taffer and Jerome Weisberg, Miami, for appellant.
Earl Faircloth, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., for appellee.
DREW, Justice.
The appellant was convicted of murder in the first degree and sentenced to death. His appeal is properly before this Court under Article V, Section 4(2), Florida Constitution, F.S.A., permitting appeals directly from trial court judgments imposing the death penalty.
It is our considered opinion that appellant's conviction and sentence must be reversed and remanded for a new trial. We discuss herein those points raised on appeal which lead us to this conclusion.
The appellant first asserts that the trial court should not have allowed the state to impeach appellant with pre-trial statements obtained in violation of the guidelines appearing in Miranda v. Arizona.[1] Disposition of this point rests upon the answers to four subordinate questions, the first being whether the Miranda test is applicable to interrogations which took place before rendition of Miranda. The United States Supreme Court in Johnson v. New Jersey,[2] has held that Miranda applies to cases in which the trial began after rendition of Miranda, even though the interrogations may have taken place prior thereto. The interrogations here occurred on January 15 and February 3, 1966, while Miranda was not handed down until June 13, 1966. Appellant's trial commenced January 29, 1968. Inasmuch as appellant's trial began some one and one-half years after rendition of the Miranda decision, the trial court was bound to test objectionable evidence by Miranda guidelines.
The second subordinate issue is whether all Miranda warnings were given to appellant. The Record clearly shows, and the state concedes, that although appellant was advised of his right to the presence of an attorney and of his right to remain silent, he was not advised that if he could not afford an attorney one would be appointed for him, as required by Miranda.
The third subordinate question is whether the interrogations were conducted amid circumstances which constituted an "in custody" or "custodial" atmosphere. The Miranda opinion itself purports to define such "in custody" interrogation:[3]
"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."
* * * * * *
"The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way."
The Supreme Court throughout its opinion described the type of environment that it had in mind with such phrases as "in a room in which he [defendant] was cut off from the outside world," "incommunicado interrogation of individuals in a police-dominated atmosphere," and "in isolation and unfamiliar surroundings."
In the case sub judice, the crime was allegedly perpetrated between the 27th day of April and the 2nd day of May, 1962. Appellant was first interrogated concerning the crime on January 15, 1966, at Belle Glade Prison Camp, in which appellant was then confined for unrelated offenses. He was not under arrest on the murder charge *344 at the time of this or a subsequent interrogation. The Belle Glade interview was conducted by two detectives from the Dade County Public Safety Department during the daytime in the office of the prison camp captain. The detectives testified that no coercive measures were used against appellant and that he was given the opportunity to get up and leave the room or do whatever he chose to do at any time. The parties were sitting during the interview, which lasted approximately two hours. Appellant had the "opportunity to take a break" during the interview, but did not do so.
The second interrogation took place in an unidentified office within the confines of Raiford Prison. Again appellant was being confined for offenses unrelated to the instant case. Again the interrogation was conducted by two investigators during daylight hours, and appellant was given the opportunity to "walk out at any time." This interrogation lasted for approximately five hours. One of the investigators testified that they displayed no anger toward appellant at any time and that the interrogation was conducted on a friendly basis in conversational tones.
In testimony before the court in the jury's absence, appellant testified that at Raiford he was threatened "with the chair and about my parole, because my parole was coming up that time," but that the statements given at Belle Glade were voluntary and that he was not compelled or intimidated in any manner at Belle Glade. Appellant further testified that he was offered some sort of "deal" by the investigators during the interrogation at Raiford, that some five or six written statements of persons in some way connected with the crime were used as a basis for a portion of the questioning there, and that he would not have answered all of the questions put to him at Belle Glade if he had been "on the outside." The trial court concluded that there was no coercion at Belle Glade, and ultimately allowed the investigators to testify as to information received at the Raiford as well as Belle Glade interrogations.
The testimony on behalf of both the state and appellant indicates that appellant was not suddenly thrust into a foreign and hostile environment and subjected to star-chamber tactics in the manner envisioned by the Court in Miranda and experienced by the four defendants in that case. Nevertheless, we conclude that he was subjected to "in custody" interrogation as that term has been further delineated by the United States Supreme Court in Mathis v. United States.[4] In Mathis, certain documents and oral statements later introduced in the defendant's trial for filing false claims against the government were obtained by interrogation while defendant was in a Florida State prison serving a state sentence. To the government's argument that Miranda should not apply because the defendant had not been put in jail by officers questioning him but was there for an entirely separate offense, the Court replied as follows:[5]
"These differences are too minor and shadowy to justify a departure from the well-considered conclusions of Miranda with reference to warnings to be given to a person held in custody.
* * * * * *
"The Government also seeks to narrow the scope of the Miranda holding by making it applicable only to questioning one who is `in custody' in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the Miranda decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the Miranda opinion which calls for a curtailment of the warnings to be given persons under interrogation *345 by officers based on the reason why the person is in custody."
Appellant was without question "in custody," as defined in Mathis, supra. It is our judgment that the permission given to appellant to depart the interrogation room at will was an illusory freedom, within the context of appellant's imprisonment, and did not overcome the custodial atmosphere as defined in Miranda and Mathis. The interrogations should have been preceded by the warnings prescribed in Miranda.
The Miranda decision itself having clearly established that evidence obtained in violation of the procedures prescribed therein may not be produced in the state's case-in-chief, it remains only for us to determine whether such evidence is nevertheless admissible against appellant solely for impeachment purposes. The state asserts that the trial court was correct when it concluded that appellant by his own testimony "opened the door" to impeaching evidence obtained at the interrogation sessions.
The appellant testified at trial in his own behalf. Those portions of his testimony pertaining to the interrogations at Belle Glade and Raiford appear in the footnote below.[6] The trial court proceeded to allow *346 the state to cross-examine appellant as to the "deal" mentioned by appellant on direct examination. On cross-examination appellant in answer to the state's questions recounted certain "deals" offered to him at Belle Glade and Raiford, and said that he did not relate any facts surrounding the murder to the interrogators while at Belle Glade.
Over appellant's objection and after denial of his motion to suppress, the court allowed two of the investigators who interviewed appellant at Raiford and at Belle Glade to testify "in rebuttal" to appellant's own testimony.[7] In addition to the mere denial that appellant had been offered any type of "deal," the detectives were allowed to recount the entire statements made to them by appellant at Belle Glade and Raiford. The stories given by appellant at Raiford differed little from the account given at Belle Glade, according to the detectives' testimony.
Appellant's statements as recounted by the investigators were extremely damaging to his cause, although appellant no doubt intended them to be exculpatory in effect. Appellant recounted a meeting with the alleged victim and a series of events at which appellant was present which ultimately led to the robbery and murder of the victim. In appellant's version of the events, appellant played a passive role in all of the activities leading up to and including taking money from the victim and sending him to his death.
This Court has recently had occasion to consider the narrow issue of whether or not "Miranda-tainted" pre-trial statements are admissible for the limited purpose of impeachment when a defendant voluntarily chooses to testify on the same subject in his own behalf. In our opinion in State v. Galasso[8] we recognized that there are two lines of cases, one permitting use of pre-trial statements secured in violation of the required Miranda warnings for the limited purpose of impeachment, and the other excluding such tainted evidence for all purposes, including impeachment. It was our belief that exclusion of such evidence even for impeachment purposes was the better view, and we see no reason to depart from this stand now, in spite of the state's request that we do so.
Our holding in Galasso rested upon the sound rationale expressed by the United States Court of Appeals, Ninth Circuit, in Groshart v. United States,[9] as well as upon certain statements in Miranda itself quoted in the Galasso opinion.
The United States Court of Appeals for the District of Columbia has gone so far as to hold that the exception to the exclusionary rule discussed in the cases of Walder v. United States[10] and Tate v. United States[11] does not apply at all to evidence obtained in violation of Miranda guidelines.[12] In Walder the defendant voluntarily made sweeping claims which "went beyond a mere denial of complicity *347 in the crimes of which he was charged." The defendant in Tate took the stand and attempted to explain his presence at the scene of the crime. The impeaching testimony established that he had told the police a different story upon being apprehended. The court noted that "the statement on rebuttal was not inherently more incriminatory than the statement on direct; it was simply a different story but significantly different so far as his credibility was concerned."[13]
Neither Tate nor Walder are applicable here, for as indicated by the appellant's testimony set out in footnote 6, supra, he made no voluntary statement in court relative to any circumstances of the crime. On the contrary, appellant denied he had any knowledge of the crime until confronted by the investigators at Belle Glade.
As in the pre-Miranda case of Johnson v. United States,[14] the police detectives' testimony here directly challenged the innocence, not merely the credibility, of the defendant. The prosecution in Johnson had attempted to introduce into evidence a confession which was inadmissible as part of the government's case-in-chief. The Court excluded the confession, even though the defendant had taken the stand and recounted his version of the complete series of events.
In the case sub judice, appellant's statements that he first learned the facts from his interrogators and that they had offered him some type of "deal," did not open the door to permit a parade of evidence not merely contradictory of appellant's testimony, but inculpating him in the crime. In his direct testimony, appellant only went so far as to state that he first received knowledge of the crime at a 1966 interview at the Belle Glade prison camp. It is readily apparent that the state is the party which on cross-examination began delving into the content and substance of the two interrogations of appellant. Appellant's mere mention of a "deal" and that he had first gained knowledge of the crime in an interview is not alone sufficient to "open the door" to the entire contents of the interrogation.[15]
The investigators' testimony was introduced over appellant's objection and it was extremely damaging to his case. The error in allowing its introduction is one ground upon which we must remand the case for a new trial.
We next consider appellant's assertion that the trial court erred in allowing into evidence numerous photographs, the cumulative effect of which was highly prejudicial to appellant. Of the total of 45 photographs introduced into evidence by the state, 22, including one in color, show all or portions of the victim's partially decomposed torso after removal of the victim from the scene of the crime. The three remaining photographs of the victim were taken at the scene of the crime as the victim was being removed from the lake in which he drowned. The body had remained in the lake for some three days and was in an advanced state of putrification. Many of the photographs are without question of a gory and gruesome nature.
The fact that the photographs are offensive to our senses and might tend to inflame the jury is insufficient by itself to constitute reversible error,[16] but the admission of such photographs, particularly in large numbers must have some relevancy, *348 either independently[17] or as corroborative of other evidence.[18]
Several of the photographs were unquestionably relevant to the issues before the jury, as one color photograph depicting a tatoo on the victim's arm for purposes of establishing his identification. One issue before the jury was whether the deceased had committed suicide or whether he was murdered, the specific question being whether the victim could possibly have arranged strands of wire around himself in the manner in which it was found upon his recovery from the lake. Several of the photographs taken in the office of the County Medical Examiner at the time of the autopsy were relevant to this issue, as they revealed the manner in which several strands of wire had been wrapped around the victim's neck and body.
We do not intend to invade the discretion of the state in the selection of evidence which it chose to present to the jury, or the discretion exercised by the trial court in admitting such evidence, but we must insure that both state and trial court act within reasonable limits. The very number of photographs of the victim in evidence here, especially those taken away from the scene of the crime, cannot but have had an inflammatory influence on the normal fact-finding process of the jury. The number of inflammatory photographs and resulting effect thereof was totally unnecessary to a full and complete presentation of the state's case. The same information could have been presented to the jury by use of the less offensive photographs whenever possible, and by careful selection and use of a limited number of the more gruesome ones relevant to the issues before the jury. In concluding that reversible error was committed by introduction of an unnecessarily large number of inflammatory photographs, we are merely applying to the facts of this case a principle reiterated in Leach v. State.[19]
"[W]here there is an element of relevancy to support admissibility then the trial judge in the first instant and this Court on appeal must determine whether the gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jury and detract them from a fair and unimpassioned consideration of the evidence."
Two of the remaining points on appeal warrant our consideration and comment. Appellant argues that the trial court erred in denying him his ten peremptory juror challenges allowable under Rule 1.350, Florida Rules of Criminal Procedure, 33 F.S.A. The Record reflects that appellant's counsel tendered the jury back to the state for further examination, the state accepted the qualifications of the jury, and the jury was sworn without objection by appellant's counsel after initial questioning of a proposed alternate juror by the state, appellant's counsel objected to the jury as then constituted because appellant had been denied the opportunity to exercise one remaining peremptory challenge. Appellant's attorney had been erroneously informed by the clerk that all ten challenges had been exhausted.
We have never stated that a defendant must use all of his peremptory challenges in order to obtain a fair trial. Appellant has not attempted to show at the trial level or in this court that there was a particular juror whom he wanted removed. Had there been a juror whom the Court had declined to remove for cause, then, conceivably there might have been "good cause" shown for permitting further challenge *349 under the circumstances. Appellant has failed to show that the trial judge abused his discretion under Florida Rule of Criminal Procedure 1.310[20] by not permitting counsel to exercise an additional peremptory challenge.[21]
Appellant also asserts as error violation of the guidelines of Witherspoon v. Illinois[22] when the court allowed the state to challenge for cause twelve jurors who objected to capital punishment. Appellant asserts that as a matter of law his right to trial by a fair and impartial jury of his peers was violated by the court allowing these challenges. The United States Supreme Court in Witherspoon held as follows:[23]
"A sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."
Witherspoon was elaborated upon in the subsequent opinion of Boulden v. Holman,[24] in which several veniremen were excused by the prosecution for cause simply on the basis of their affirmative answers to the question of whether, in the statutory language, they had "a fixed opinion against" capital punishment. Other veniremen were excluded "merely by virtue of their statements that they did not `believe in' capital punishment." A footnote to the opinion contains samples of questions indicating the manner in which the state phrased its inquiries into opposition to capital punishment.
Suffice it to say that an examination of the record of the entire voir dire examination indicates that the jury selected in this cause was not by any means "organized to return a verdict of death," as the jury was characterized in Witherspoon. Counsel for the state was careful in each instance to determine the nature and extent of the prospective juror's objection to capital punishment. When the venireman indicated that he did have an objection to capital punishment, counsel would pose the following question or equivalent questions: "Would this objection prevent you from returning a verdict that carried with it the death penalty?" Once a definite affirmative answer to this question was received, the juror was removed for cause by the court. All prospective jurors excused for their objections to capital punishment stated in effect that they would be unable to return a verdict that would carry with it the death penalty. This is unlike Witherspoon, where forty-seven veniremen were excused, only five of whom stated that under no circumstances could they vote to impose the death penalty, or Bolden, supra, where several jurors were excused simply because they said they could not believe in capital punishment. The guidelines of Witherspoon v. Illinois, supra, and Bolden v. Holman, supra, were fully met, and appellant's assertion of error on this point is without merit.[25]
*350 We have considered the other assigned errors and find them to be without merit.
Reversed and remanded for a new trial.
It is so ordered.
ERVIN, C.J., CARLTON and BOYD, JJ., and SPECTOR, District Court Judge, concur.
ROBERTS and ADKINS, JJ., dissent.
NOTES
[1] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).
[2] 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).
[3] 384 U.S. 436, 444, 477, 86 S.Ct. 1602, 1612, 1629, 16 L.Ed.2d 694, 706, 725 (1966).
[4] 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).
[5] 391 U.S. at 4, 5, 88 S.Ct. at 1504, 1505, 20 L.Ed.2d at 384, 385 (1968).
[6] [Direct Examination]

"Q When did you first have knowledge of this crime that you are charged with?
"A In the year 1966.
"Q What was the occasion of that?
"A Sergeant Beck came and had an interview with me at a prison camp in Belle Glade."
* * * * *
"Q Were you ever promised immunity to testify in this case on this charge?
"THE COURT: Yes or no, Mr. Young.
"A They said a deal; they didn't say anything about immunity.
"Q What did you tell them?
"A I told them no, sir, after he had told me the details.
"MR. SMITH: Your Honor, we will withdraw that question.
"THE COURT: He has answered that question, Mr. Smith. You don't withdraw it after there is an answer. Go ahead."
* * * * *
"Q [By Mr. Smith] Have you ever been questioned about this case other than when you have been in custody? [Emphasis added.]
"A In '66 at Belle Glade.
"Q No. I said other 
"MR. SMITH: That is not the answer, Your Honor.
"Q [By Mr. Smith] Other than when in custody.
"THE COURT: I don't know what answer you want. He gave an answer, in Belle Glade.
"MR. SMITH: I don't think he understood the question, if he has ever been questioned about this case any time outside of being in custody, when he was in prison or in jail.
"THE COURT: When you were a free man.
"THE WITNESS: No, sir,
"Q [By Mr. Smith] Again, is there anything at all that you know about this case against you?
"A Only what I have heard, sir.
"MR. SMITH: Your witness, sir." [Cross Examination]
"BY MR. JACOBS:
"Q Where did you hear this, Mr. Young?
"A From Detective Beck.
"Q In Belle Glade?
"A Right.
"Q And in Raiford?
"A Right, sir.
"Q What did you hear from him?
"MR. SMITH: Your Honor, I object on the grounds it is immaterial and highly irrelevant.
"MR. JACOBS: He opened the door.
"THE COURT: Are you kidding? Overruled. You asked whether he was interrogated up there.
"MR. SMITH: If he was interrogated any place other than where he was in custody, Your Honor, and he said no. I didn't ask where he was interrogated."
* * * * *
"Q [By Mr. Jacobs] Were you interviewed by the detective at Raiford?
"MR. SMITH: Your Honor, instruct the witness if he answers it, he is only answering it over my objection.
"THE COURT: All right, and I am going to instruct him to answer it over your objection. You are overruled.
"Q [By Mr. Jacobs] Mr. Young 
"A Yes, sir.
"Q [continuing]  is that where you claim that the detectives told you about the case?
"A They first told me about it in Belle Glade, sir.
"Q Do you say that they later told you about it in Raiford?
"A Yes.
"Q And did you tell them that you were at Palmer Lake when this car went into the water?
"A No, I didn't.
"MR. SMITH: Again, I object to the question. That is way beyond the scope.
"THE COURT: You are sustained."
* * * * *
[7] Before allowing the investigators to testify, the trial court in the absence of the jury took considerable testimony from both the investigators and appellant relative to circumstances of the interrogations, these circumstances having been earlier summarized in the text. The trial court concluded that appellant's statements were given voluntarily and without coercion, and on that basis permitted the investigators to take the stand.
[8] 217 So.2d 326 (Fla. 1968).
[9] 392 F.2d 172 (9th Cir.1968).
[10] 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).
[11] 109 U.S.App.D.C. 13, 283 F.2d 377 (1960).
[12] Johnson v. United States, 120 U.S. App.D.C. 69, 344 F.2d 163 (1964).
[13] 109 U.S.App.D.C. 13, 283 F.2d 377, 380 (1960).
[14] 120 U.S.App.D.C. 69, 344 F.2d 163 (1964).
[15] See United States v. Armetta, 378 F.2d 658 (2d Cir.1967), for a discussion of situations distinguishable from the instant cause.
[16] Calloway v. State, 189 So.2d 617 (Fla. 1966); Pleas v. State, 184 So.2d 647 (Fla. 1966).
[17] Dyken v. State, 89 So.2d 866 (Fla. 1956).
[18] Pleas v. State, 184 So.2d 647 (Fla. 1966).
[19] 132 So.2d 329, 331-332 (Fla. 1961).
[20] Florida Rule of Criminal Procedure 1.310. Time for Challenge. "The state or defendant may challenge an individual prospective juror, for cause or peremptorily, only before the juror is sworn to try the cause; except that the court may, for good cause, permit it to be made after the juror is sworn, but before any evidence is presented."
[21] See King v. State, 125 Fla. 316, 169 So. 747 (1936).
[22] 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
[23] Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776, 784, 785 (1968).
[24] 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).
[25] See Williams v. State, 228 So.2d 377 (Fla. 1969).