Joseph B. CANNITO, Petitioner,

v.

Maurice H. SIGLER, Warden, Nebraska State Penitentiary, Respondent.

Edward J. KONDER, Petitioner,

v.

Maurice H. SIGLER, Warden, Nebraska State Penitentiary, Respondent.

Civ. Nos. 1593 L, 1594 L.

United States District Court, D. Nebraska.

Jan. 8, 1971.

William F. Wright, Lincoln, Neb., for petitioner Joseph B. Cannito.

James A. Beltzer, Grand Island, Neb., for petitioner Edward J. Konder.

Ralph H. Gillan, Asst. Atty. Gen., for respondent.

## MEMORANDUM OF DECISION

URBOM, District Judge.

The petitioners are confined to the Nebraska Penal and Correctional Complex as a result of convictions of the crime of robbery by a single jury in the District Court of Buffalo County, Nebraska. They raise constitutional issues regarding the following subjects:

(1) The giving of oral testimony about physical objects after the physical objects themselves had been suppressed by the trial court on the ground that they had been the subject of an illegal search and seizure;

(2) The introduction in evidence for impeachment purposes of a physical object which previously had been suppressed by the trial court as having been the subject of an illegal search and seizure;

(3) The making of an audible statement by an alternate juror as to her impressions of the guilt of the defendants at the time she was being excused from service;

(4) Publicity in newspapers of the court's suppression of items of evidence;

(5) The appointment of the same attorney to defend both petitioners at their trial on the criminal charge; and

(6) In-court identifications of the petitioners.

The two habeas corpus actions were consolidated in this court for the evidentiary hearing. The facts as found by this court will be set out hereinafter as they relate to each specific issue.

THE GIVING OF ORAL TESTIMONY ABOUT PHYSICAL OBJECTS AFTER THE PHYSICAL OBJECTS THEMSELVES HAD BEEN SUPPRESSED BY THE TRIAL COURT ON THE GROUND THAT THEY HAD BEEN THE SUBJECT OF AN ILLEGAL SEARCH AND SEIZURE

■ The robbery for which the petitioners were convicted was of a Safeway grocery store in Kearney, Nebraska, on the night of September 2, 1967. On September 8, 1967, the petitioners by an assumed name, Joseph Kane, 111 Lawrence Street, Syracuse, New York, checked into a motel in Kimball, Nebraska, which was operated by Cecil Armbruster. They paid one night's lodging cost, which entitled them to use of a room until 10:00 a. m. on September 9, 1967. Shortly after 10:00 a. m. on September 9 Cecil Armbruster, the motel operator, went to the room to strip the beds for the maids, found the room locked, opened it with his key, entered the room and observed a revolver lying on the desk, some screwdrivers, a glass cutter and a white or light-colored coat, and he saw that the bed had not been slept in. Armbruster then left the room and telephoned the sheriff, Merle Barker. He told the sheriff the name which appeared on the registration card. When the sheriff arrived, Armbruster unlocked the room and the sheriff entered the room, observing a black-handled .22 revolver and a brown leather case, a light tan trench coat on the davenport, and, by lifting the mattress on a bed, a .38 revolver with a brown handle and a black case. At the time he went to the motel the sheriff had no reason to make any connection between the petitioners and the motel or any of the contents of the room. The petitioners had been arrested by the sheriff on the night of September 8 and thereafter he held them in custody, but they had denied to him that they had stayed or were staying in Kimball and had asserted that they had sent their clothing to New York. It was only after the sheriff's entry into the room that he made any mental connection between any of the items in the room and either of the petitioners. Without touching any of the items in the room, he left for the purpose of obtaining a search warrant and thereafter returned and seized the physical items described.

The District Court of Buffalo County sustained a motion to suppress these physical objects and did not permit their introduction into evidence, with one exception not material to the present issue. It did permit Armbruster and Sheriff Barker, however, to testify to their observations of those physical objects. Whether that ruling was proper in light of the Fourth Amendment of the Constitution of the United States is the issue. I conclude that it was proper. All observations testified to were made before any illegal search or seizure occurred. Armbruster, as the motel operator, had a right to be in the room after expiration of the checkout time and there was nothing improper about his asking the sheriff to enter the room. There was no unreasonable search within the meaning of the Fourth Amendment prior to the sheriff's leaving to obtain a search warrant. The subsequent illegal seizure of the objects has no effect upon the admissibility of testimony of observations of those objects made before the illegal search or seizure. I subscribe to the view of Hollingsworth v. United States, 321 F.2d 342 (C.A. 10th Cir. 1963) wherein it was said:

"Evidence obtained by an unlawful search and seizure may not be used by the Government in a court proceeding or otherwise. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319. But as the late Mr. Justice Holmes stated in his opinion in that case, 'Of course this does not mean that facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others * * *'"

The case of McGinnis v. United States, 227 F.2d 598 (C.A. 1st Cir. 1955),

relied upon by the petitioners, does not hold otherwise. In that case the initial search was held to be illegal, because founded upon an improperly issued search warrant, and the second search was declared illegal because it was founded upon information gained in the first illegal search. Observations made during either of those searches could not be related as testimony by the observers. The court clearly makes the point by stating:

> "We find no basis in the cases or in logic for distinguishing between the introduction into evidence of physical objects *illegally* taken and the introduction of testimony concerning objects *illegally* observed. \* \* \*
>
> \* \* \* \* \* \*
>
> "We believe that when the trial court excluded the hydrometer and saccharometer and all testimony relating to these items taken during the illegal search made on Saturday, February 27, it ought likewise to have excluded all testimony as to all observations *made during that illegal search.* \* \* \*" (emphasis added)

In the present case, however, the observations related in the testimony by Armbruster and the sheriff were not observations made during an illegal search, but were observations made legally before any illegal search was begun. Although an illegal search eliminates the use of evidence gained by that illegal search, it does not relate retroactively to disqualify evidence gained earlier.

Thus, the first issue raised by the petitioners will be resolved against them.

## THE INTRODUCTION IN EVIDENCE FOR IMPEACHMENT PURPOSES OF A PHYSICAL OBJECT WHICH PREVIOUSLY HAD BEEN SUPPRESSED BY THE TRIAL COURT AS HAVING BEEN THE SUBJECT OF AN ILLEGAL SEARCH AND SEIZURE

One of the witnesses to the robbery, Larry Arnold, testified at the criminal trial that one of the robbers had a gun with a black handle and that the gun was under a black leather belt. Another witness, Richard Eickenberg, testified at the criminal trial that he saw one of the robbers with a .38 snubnose gun with a light brown handle and one robber who had a gun stuck in his belt, which gun handle was "darker," and in response to a direct question of whether it could have been black, he said "It could have been black."

The defendant Konder took the stand and testified on direct examination to his having been in a location a considerable distance from the scene of the robbery at the time of the robbery. He at no time during direct examination mentioned the subject of ownership or possession of guns, but on cross-examination he was asked whether on September 8 or 9, which was a week after the robbery and was the time of the occupancy of the motel by the defendants, he owned or had a gun. Konder testified that he had a .22 caliber single action pistol, the handle of which was "a nondescript color" or "grayish—grayish black" and a .38 with a black handle. On rebuttal the state was permitted to introduce exhibits 4 and 5, a .38 snubnose pistol, the color of which was not identified in the record, and a .22 caliber pistol, the handle of which was said by the rebuttal witness to be black. Neither gun is in evidence here. These guns, according to the testimony, were guns "inventoried from the Kimball motel" and were guns which Konder and Cannito had claimed title to. The guns were received in evidence for impeachment only.

The respondent does not question the ruling of the state trial court that the guns were seized illegally, but seeks to justify reception into evidence of them on the basis of Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). In the *Walder* case a heroin capsule had been suppressed as having been obtained through an unlawful search and seizure in 1950. In 1952 the same defendant again was indicted, but this time on an offense unrelated to the heroin capsule, although involving nar-

cotics. The defendant took the stand and on direct examination testified broadly that he had never had any narcotics in his possession. The government on cross-examination questioned him about the heroin capsule unlawfully seized from him in 1950, and in rebuttal the government put on the stand one of the officers who had participated in the unlawful search and seizure. The trial judge admitted the evidence and charged the jury that it had been received solely for the purpose of impeaching the defendant's credibility. The Court of Appeals for the Eighth Circuit affirmed. 201 F.2d 715. The Supreme Court of the United States, speaking through Mr. Justice Frankfurter, also affirmed, saying:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine [Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652] would be a perversion of the Fourth Amendment.

"Take the present situation. Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."

Since 1954, the courts have sought to refine the perimeters of the *Walder* case. Most of the decisions have not dealt with evidence obtained by illegal search and seizure, but by other illegal means.[1]

None of the cases, however, suggests a test for determining the applicability of the *Walder* doctrine in search and seizure cases, such as the case at bar, better than that pointed out in the *Walder* opinion. The Supreme Court there specifically distinguished Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). The basis for the distinction was that in *Agnello* the government first raised by cross-examination the subject later touched by its impeachment and this basis was stated by the court as follows:

"The situation here involved is to be sharply contrasted with that presented by Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145. There the Government, after having failed in

1. The following cases provide an excellent review of the agonies of interpretation confronted by the courts:

United States v. Curry, 358 F.2d 904 (C.A. 2d Cir. 1966); United States v. Fox, 403 F.2d 97 (C.A. 2d Cir. 1968); Tate v. United States, 109 U.S.App.D.C. 13, 283 F.2d 377 (1960); Proctor v. United States, 131 U.S.App.D.C. 241, 404 F.2d 819 (1968); United States ex rel. Hill v. Pinto, 394 F.2d 470 (C.A. 3rd Cir. 1968); Groshart v. United States, 392 F.2d 172 (C.A. 9th Cir. 1968); State v. Brewton, 247 Or. 241, 422 P.2d 581, cert. den., 387

U.S. 943, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1968).

For discussion, see 34 U.Chi.L.Rev. 939.

Since the present decision was rendered, the Supreme Court of the United States in Harris v. New York, 91 S.Ct. 643 (Feb. 24, 1971) has held statements obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to be admissible on cross-examination to impeach the party-witness who had assumed position on direct examination inconsistent with that assumed during his police interrogation.

its efforts to introduce the tainted evidence in its case in chief, tried to smuggle it in on cross-examination by asking the accused the broad question 'Did you ever see narcotics before?' After eliciting the expected denial, it sought to introduce evidence of narcotics located in the defendant's home by means of an unlawful search and seizure, in order to discredit the defendant. * * *"

In *Walder* the defendant had taken the stand and "Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics." In the present case the subject of ownership or possession of guns was first raised by the government on cross-examination of the defendant and then the government sought to discredit the defendant by showing that his answer as to the color of one or both guns was incorrect. Konder did not of his own accord raise the subject. He testified only to his whereabouts on the day of the crime. It cannot be said that this circumstance fits the *Walder* picture as closely as it matches the *Agnello* scene. *Agnello,* therefore, governs.

The question is not whether the ownership or possession of guns was relevant to the guilt of the defendant, as the respondent argues, but whether the government can be permitted to use evidence illegally obtained by it. I conclude that it cannot do so, if that evidence has been obtained by an illegal search and seizure and if the subject of the testimony giving rise to the impeachment has been introduced on cross-examination by the government, irrespective of whether that subject is relevant or irrevelant.[2] A contrary holding would not fulfill the declaration of the *Walder* case that the defendant "must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it. * * *". Here, possession or ownership of guns fitting the description of guns used during the robbery was so critical a matter that it can hardly be said not to have constituted an element of the case. He therefore had to be free to deny possession of such guns at the time of the crime without thereby "giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it." Possession and ownership a week after the crime of guns fitting the description of those used in the crime falls in precisely the same category.

If there is to be a weighing of relative values—the prevention of perjury on the part of an accused, on the one hand, and maintenance of governmental integrity, on the other—the latter must prevail. Mr. Justice Brandeis declared it this way:

"Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law

---

2. The respondent argues that failure of counsel to object to cross-examination questions on possession or ownership of guns on any ground except relevancy affects the government's right to use the illegally seized evidence. I think neither the fact of nor reason for an objection to the cross-examination questions makes any difference. The propriety of the cross-examination is not the issue; the ability of the state to use the illegally seized guns as evidence is the issue. An objection to the introduction of the illegally seized guns was made, calling attention of the court to the earlier suppression ruling. If an objection was necessary, that was ample.

unto himself; it invites anarchy. * * *" 3

I conclude that admission of the guns into evidence over the objection of defendants' counsel was error and violated the Fourth Amendment rights of the petitioners. I can find no basis for distinction between the two petitioners in that regard, even though Konder is the only one who testified.

## THE MAKING OF AN AUDIBLE STATEMENT BY AN ALTERNATE JUROR AS TO HER IMPRESSIONS OF THE GUILT OF THE DEFENDANTS AT THE TIME SHE WAS BEING EXCUSED FROM SERVICE

■ It appears from the record that when the alternate juror, Mrs. Lila Roker, was excused from service at the end of the evidence, she was understood by a spectator, John T. Tarrell, to say, "They're guilty." The record fails to disclose any raising of that episode before the trial court until the motion for new trial was heard. At that time an affidavit of Mr. Tarrell was placed in evidence and a question and answer statement of Mrs. Roker, taken by the jury commissioner, was received in evidence. Mrs. Roker's statement was to the effect that she could not remember that she had said a thing to the jurors. The court overruled the motion for a new trial.

No authority is cited by either counsel on this subject. It is my conclusion that there is no constitutional error shown in the record and that the petitioners' claim in that regard, therefore, must be denied. My conviction is that a matter of the possible prejudicing of a jury by such a statement must be drawn to the attention of the trial court immediately upon its happening, rather than awaiting a jury verdict, to the end that some avoidance of prejudice may be brought about. The failure to do that, coupled with a lack of any showing in the record

before this court of prejudice must result in denial of petitioners' third contention.

## PUBLICITY IN NEWSPAPERS OF THE COURT'S SUPRESSION OF ITEMS OF EVIDENCE

■ The petitioners assert that they have been denied due process because the jurors had read prior to the trial newspaper accounts of the court's suppression of certain evidence. This issue cannot be decided by this court, for the reason that it has not been raised before the Supreme Court of Nebraska, either by direct appeal or by a post-conviction proceeding, and the petitioners, therefore, have failed to exhaust their state remedies.

## THE APPOINTMENT OF THE SAME ATTORNEY TO DEFEND BOTH PETITIONERS AT THEIR TRIAL ON THE CRIMINAL CHARGE

■ This issue has not been presented on direct appeal or any post-conviction action to the Supreme Court of Nebraska. No facts are shown to suggest that this court properly should decide the issue in the absence of such a presentation.

## IN-COURT IDENTIFICATIONS OF THE PETITIONERS

■ Two men, Rodney Bunde and Larry Arnold, positively identified at the criminal trial the petitioners as the men who robbed the Safeway store. Prior to the trial, pursuant to a motion to suppress, the state trial court conducted a hearing and concluded that under the cases of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), these two witnesses would be

permitted to identify the defendants in court. The basis for the motion to suppress was that Bunde and Arnold had been taken by law enforcement authorities to Kimball, Nebraska, for the purpose of viewing the defendants and had viewed them without the defendants' having known it and without counsel for the defendants having been provided.

Gilbert v. California, supra, makes it clear that a post-indictment pretrial line-up at which the accused is exhibited to identifying witnesses is a critical stage of the criminal prosecution and that police conduct at such a line-up without notice to counsel and in the absence of counsel denies the accused his Sixth Amendment right to counsel and that the admission of the in-court identifications "without first determining that they were not tainted by the illegal line-up but were of independent origin" is constitutional error.

Two distinctions appear at once between the *Gilbert* case and the present case. First, in the present case the pretrial out-of-court identification was not a post-indictment proceeding. Second, in the present case a hearing was held by the state trial judge at which it was determined that the in-court identifications would not be tainted by the out-of-court identification but were of independent origin. The Supreme Court of Nebraska affirmed that finding. State of Nebraska v. Cannito, 183 Neb. 575, 162 N.W.2d 260 (1968).

The pretrial identification was made on September 9, 1967, at the courthouse in Kimball, Nebraska. Konder and Cannito were taken from their cells to the courtroom, where they were questioned. During that questioning Arnold and Bunde were brought into the courtroom, where they viewed Konder and Cannito and identified them as the persons who had robbed the store. By the time Bunde and Arnold had thus viewed the petitioners, the petitioners had been informed of their constitutional rights, including the right to counsel but no counsel had been afforded and the petitioners were not informed that they were being or were about to be viewed by witnesses. By the time of this viewing entry had been made into the motel room occupied by Konder and Cannito and various physical objects had been removed. Some objects had been shown to Bunde and Arnold before the identification. At most these consisted of a trench coat, some shirts, one or more guns, and a pair of glasses. A composite drawing or drawings from information gained by a criminal investigator of the Nebraska State Patrol from witnesses might have been seen by Bunde and Arnold before the identification. Bunde and Arnold were not given any instructions by any law enforcement official with respect to the identification, except that they were told to be sure of their identification. Both these witnesses had previously gone to Fairfax, Missouri, with a law enforcement officer to identify suspects and had determined that the suspects were not the Safeway robbers.

At the trial Bunde testified that he could have picked Konder and Cannito out of a line-up of similar men and at the hearing in this court he testified that his in-court identification was based upon his having seen the petitioners at the robbery and not upon his having seen them at the pretrial confrontation.

At the trial Bunde testified in detail regarding Konder's manner of speaking, manner of walking, his wearing of a light tan trench coat, his possessing a mustache and his wearing of red spotted glasses. These were observed during a period of approximately five to eight minutes when the robbers demanded that Bunde open the safe, take money out of it, place the money in a sack, and then lie on the floor. He actually observed Konder about five minutes. Arnold testified at the trial that he saw both men outside the store where they asked him if they could get in to pick a

loaf of bread. They went into the store and asked for the manager and then said that it was a hold-up. Cannito stayed with Arnold and for a minute or two Cannito was two or three feet away from Arnold and Arnold was lying on his back looking up at Cannito.

The hearing held by the state trial court prior to the trial was the very kind of hearing directed by the United States Supreme Court in Gilbert v. California. The evidence before that court fully justified a finding that the in-court identifications were not tainted by the pretrial confrontation. Furthermore, I conclude from the evidence before this court that the in-court identifications were not tainted by the pretrial confrontation but were based upon observations made at the time of the robbery and not from observations made in Kimball, Nebraska, on September 9, 1967, in the confrontation. Thus, whether the confrontation was a critical stage of the criminal proceeding, even though it was not a post-indictment confrontation, and whether that confrontation was illegal because of absence of counsel are without significance. Under the standard of Gilbert v. California the in-court identifications were properly received because they were of independent origin, even if the identification proceeding be considered illegal.

The contentions of the petitioners respecting the in-court identifications will be rejected.

## CONCLUSION

The claims regarding publicity and appointment of counsel will be dismissed without prejudice. Because of the constitutional impropriety in receiving the guns in evidence, an order will be entered, issuing a writ of habeas corpus unless the State of Nebraska grants to the petitioners a new trial within 90 days, and the petition to that extent will be granted and otherwise will be denied.